**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ANGELICA M.,
     Plaintiff,                     :           CIVIL CASE NO.
                                 :           3:20-CV-00727 (JCH)
v.                             :
                                 :
ANDREW SAUL,
COMMISSIONER OF
SOCIAL SECURITY,                         JULY 14, 2021
     Defendant.                  :

**RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER (DOC. NO. 18) AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (DOC. No. 20)**

## I.    INTRODUCTION

Plaintiff Angelica M. ("Angelica") brings this action under section 405(g) of title 42 of the United States Code, appealing the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Supplemental Security Income ("SSI") benefits. See Compl. (Doc. No. 1). She moves to reverse the decision of the Commissioner. Mot. for Order (Doc. No. 18); Mem. of Law in Supp. of Mot. to Reverse the Decision of the Comm'r (Doc. No. 18-2) ("Pl.'s Mem."). The Commissioner cross-moves for an order affirming his Decision. Mot. for Order (Doc. No. 20); Def.'s Mem. in Supp. of her Mot. for an Order Affirming the Comm'r's Decision (Doc. No. 20-1) ("Def.'s Mem.").

For the reasons discussed below, the court vacates the ALJ's decision and remands for further proceedings to develop the record.

III. **BACKGROUND**

A. <u>Facts</u>

The court adopts the facts as stated in the Joint Statement of Facts. <u>See</u> Plaintiff's Statement of Material Facts (Doc. No. 18-1); Defendant's Response to Plaintiff's Statement of Facts (Doc. No. 20-2). The facts relevant to the issues the court addresses here are set forth below.

Angelica was born on February 23, 1991. <u>See</u> Admin. Record ("AR") (Doc. No. 16) at 91. She filed an application for SSI benefits on October 3, 2017, alleging disability since January 1, 2012. <u>Id.</u> at 15. In her application, she listed several mental conditions that limited her ability to work, including bipolar disorder, ADHD, impulsive control disorder, depression, and PTSD. <u>Id.</u> at 446. Angelica has not performed substantial gainful activity since she filed her application. <u>Id.</u> at 17.

The record begins in Angelica's youth, with documents from her in-patient stay at Hall-Brook Behavioral Services when she was 12 years old. <u>Id.</u> at 535-36. A year later, she was also in-patient at the Riverview Hospital for Children and Youth. <u>Id.</u> at 539-66. There is a more than five-year gap in the record from her discharge from Riverview until a report of testing at the Polaris Center School in September 2009, a psychological evaluation in January 2010, and a counseling summary from Venture Academy in April 2012. <u>Id</u>. at 434-35; 436-39; 264.

From there, the record again suspends until August 2017, almost two months before she submitted her SSI application. At that point, Angelica sought treatment at the Wheeler Clinic for her ""bad mood swings, anxiety, [and] depression" that had led to "multiple incidents of [domestic violence] between Angelica and [her] family [and] romantic partners." <u>Id.</u> at 600. She also reported a history of asthma and ongoing

gastrointestinal difficulties.  Id.  The assessment listed cannabis use disorder, severe; disruptive mood dysregulation disorder; major depressive disorder, recurrent episode, moderate; and other specified anxiety disorder as Angelica's behavioral health diagnoses, and recommended an intensive outpatient program as treatment.  Id. at 598, 600.  Angelica initially declined the treatment referral because it required her to "participate in a group setting with others."  Id. at 600.  After being pressed, however, she did agree to weekly group and individual treatment.  Id.

On September 6, 2017, Angelica returned to the Wheeler Clinic for a psychiatric evaluation with Angela Roberts, APRN.  Id. at 602-05.  Angelica explained to APRN Roberts that she had a "long history of aggression, mood swings[,] surges of energy, racing thoughts, difficulty falling [and] staying asleep, impulsivity, anxiety [and] panic attacks, and cannabis dependence."  Id. at 605.  She complained her mood swings were getting worse, in part because she had been off medication for years.  Id. at 603. The diagnosis included bipolar disorder, generalized anxiety disorder, PTSD, cannabis dependence, and mid-intermittent asthma.  Id. at 604.  Angelica was prescribed lithium to target her mood swings and was instructed to follow up in two weeks.  Id. at 605.

On September 18, Angelica reported to APRN Roberts that she had "noticed [a] slight improvement in [her] mood since starting lithium."  Id. at 606.  She was also prescribed trazodone after reporting that she was having difficulty sleeping.  Id. at 607. At a medication management and psychiatric session with APRN Roberts on October 30, Angelica reported that her symptoms were "mild . . . [but] occur constantly" and were "chronic."  Id. at 609.  However, she also reported that her mood had continued to improve since beginning lithium, and that she no longer had difficulty sleeping.  Id.  Her

symptoms were described as improved and "fairly controlled," and she was prescribed bupropion as well.  Id. at 609-10.  Throughout these three sessions with APRN Roberts, Angelica was consistently observed to be alert and cooperative, with fair judgement and insight and her memory, attention, and concentration all intact.  Id. at 604, 606-07, 610. In a follow-up visit on December 6, 2017, APRN Roberts observed that Angelica's symptoms had worsened and that she again had difficulty sleeping, but assessed that overall her symptoms remained "fairly controlled."  Id. at 635.

Angelica continued to seek treatment from the Wheeler Clinic until early 2018, when she was "discharge[d] due to poor attendance."  Id. at 675.  She returned to the clinic on July 26, 2018.  Id.  In a meeting with Meghan Slomcinsky, Angelica reported that, during the intervening months, she had been diagnosed with thyroid disease and had been prescribed Synthroid to address it.  Id.

Angelica's continued to visit the Wheeler Clinic throughout the fall of 2018. During her appointments with Michael Twist, D.O., and Alyssa Boynton, she continued to report her symptoms as chronic but "moderate," and no significant changes in behavior were noted.  Id. at 662, 665.  Angelica's home situation continued to deteriorate, with "her family "continually pulling her into fights."  Id. at 34.  She reported that she remained unmotivated and that she continued to struggle with mood swings and aggressive behavior.  Id. at 35-36.

By 2019, "things [were] gradually improving at home," and Angelica was "making a point to leave the house" when she could.  Id. at 43.  However, she reported that her symptoms had worsened to the point of being "incapacitating" by the time she saw Lynne Severance, APRN, at the Wheeler Clinic in March.  Id. at 46.  During that visit,

her sister reported that Angelica's attempts to taper off the lithium had been unsuccessful, and that she was having suicidal thoughts.  <u>Id.</u>  Her lithium dosage was increased back to 600 mg twice a day, and she was also prescribed Seroquel.  <u>Id.</u>  The final chart note in the record is dated April 5, 2019, from APRN Severance.  <u>Id.</u> at 55-60.  In it, she documents a physical altercation Angelica had with her brother, and Angelica's continued suicidal ideation.  <u>Id.</u>  Her medication was further adjusted, increasing her Seroquel dosage and adding Vistaril.

      B.     <u>Procedural History</u>

Angelica submitted her application for SSI benefits on October 3, 2017, alleging disability since January 1, 2012.  <u>See</u> AR at 15.  In a Disability Determination dated November 29, 2017, her application was denied.  <u>Id.</u> at 91-103.  After filing a request for reconsideration on December 27, 2017, he claim was again denied on April 19, 2018.  <u>Id.</u> at 129, 105-18.  On June 4, 2018, Angelica requested a hearing before an Administrative Law Judge ("ALJ").  <u>Id.</u> at 134.

On January 9, 2019, the hearing was held before the ALJ.  <u>Id.</u> at 62-89.  Angelica, represented by an attorney, appeared with her sister, and a vocational expert testified as well.  <u>Id.</u> at 62.  Angelica testified that she had been fired from the last part time job she had back in 2016 "due to [her] outbursts," and that the other scant employment she had before that had been short-lived for similar reasons.  <u>Id.</u> at 69-70.  She testified that she could not work because she "get[s] outbursts easily.  I could be agitated for no reason, to where I'll catch an attitude with people.  There's times I actually assaulted others."  <u>Id.</u> at 70.  As the ALJ continued with his questions, Angelica started "getting . . . agitated."  <u>Id.</u> at 73.  Her sister testified that Angelica was "depressed, anxious . . . she doesn't really tolerate crowds, being with people she

doesn't know." Id. at 82. "She can be compulsive with her behavior . . . she doesn't sit well with authority figures. Her sleep is all over the place, so she really can't maintain a real schedule . . . It's just been hard for her to maintain anything." Id. at 83.

The vocational expert also testified. Id. at 86-89. Responding to a hypothetical question posed by the ALJ, he assessed that an individual with Angelica's profile and residual functional capacity ("RFC") would be able to perform the work of a laundry worker, kitchen helper, and hand packer, of which there are 3.2 million jobs in the national economy collectively. Id. at 87. This number was adjusted downward in response to alterations to the hypothetical from Angelica's attorney, and when the ALJ asked if there were jobs that an individual could sustain if they "would experience symptoms causing the individual to become off task at unpredictable intervals . . . in the range of ten to 15% of a typical workday or workweek of either being absent from the worksite or off task," the vocational expert said there were not. Id. at 87-88.

A month later, the ALJ issued his Decision denying Angelica's claim. Id. at 12-29. In step one of his analysis, he determined that Angelica had not engaged in substantial gainful activity since October 3, 2017, the day she applied for SSI. Id. at 17. In step two, her found that Angelica had four severe impairments, in particular depressive disorder, personality disorder, substance addiction, and trauma disorder. Id. Next, in step three, he concluded that she did not have an impairment or combination of impairments that met the severity of a listed impairment in Appendix 1 to subpart P of part 404 of title 20 of the Code of Federal Regulations. Id. at 17-19.

In step four, the ALJ determined Angelica's RFC. After considering the entire record before him, he concluded that she had the RFC "to perform a full range of work

6

at all exertional levels but with the following non-exertional limitations: she is able to understand, remember, and carry out simple instructions for 2 hour segments over the course of a work day in a setting with no public contact; is limited to occasional contact with coworkers provided that collaboration on task performance is not required; and is able to tolerate occasional, simple workplace changes." Id. at 19. Finally, the ALJ determined at step five that there were jobs that exist in significant numbers in the national economy that Angelica could perform. Id. at 24. Specifically, he echoed the findings of the vocational expert and concluded that she would be able to perform "occupations such as laundry worker . . . kitchen helper . . . and hand packer." Id.

Angelica requested review of the ALJ's decision on March 20, 2020. Id. at 182-84. Five days later, the Appeals Council denied her request, making the ALJ's February 13, 2019 decision the final decision of the Commissioner. Id. at 1-6. On May 26, 2020, Angelica filed a civil complaint before this court.

## IV.    STANDARD OF REVIEW

The ALJ follows a five-step evaluation to determine whether a claimant is disabled within the meaning of the Social Security Act. At the first step, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If not, the Commissioner proceeds to the second step and considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities. If the claimant has a "severe impairment," the Commissioner proceeds to step three and asks whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. See 20 C.F.R. § 416.920(a)(4). If the claimant has one of these enumerated impairments, the Commissioner will automatically consider that claimant

disabled, without considering vocational factors such as age, education, and work experience.  Id.

If the impairment is not "listed" in the regulations, the Commissioner proceeds to step four and asks whether, despite the claimant's severe impairment, he or she has the RFC to perform past work.  At step five, the Commissioner determines whether there is other work the claimant could perform.  Id.  To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The Commissioner bears the burden of proof on the fifth step, while the claimant has the burden on the first four steps.  See McIntyre v. Colvin 758 F.3d 146, 150 (2d Cir. 2014).

The court's review of the Commissioner's decision "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation omitted); see 42 U.S.C. § 405(g). "Substantial evidence" requires "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  When considering mental illnesses, "[c]ycles of improvement and debilitating symptoms . . . are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and treat them as a basis for concluding a claimant is capable of working."  Estrella v. Berryhill, 925 F.3d 90, 97 (2d Cir. 2019) (citations and internal quotations omitted); see also Stacey v. Comm'r of Soc. Sec. Admin., 799 F.

App'x. 7, *10 (2d Cir. 2020) ("[Plaintiff] occasionally being in a good mood does not undermine the conclusion that he is severely limited in social interactions.").

## V.    DISCUSSION

### A.    Development of the Record

Angelica first argues that the ALJ failed to adequately develop the record.  Pl.'s Mem. at 1-9.  She also argues that the ALJ erred in evaluating the evidence in several ways, and that his RFC and Step Five findings are not supported by substantial evidence.  Id. at 9-25.

The court begins with the first issue Angelica raises: adequate development of the record.  An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately.  See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under section 405(g) of title 42, "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record."  Scott v. Astrue, No. 09-CV-3999, 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (internal quotations omitted).

Angelica argues that the ALJ failed to adequately develop the record by failing to

seek medical source statements from APRN Roberts and Dr. Twist.[1]  Pl.'s Mem. at 3.

She also argues that the medical source statements in the record were deficient for a

variety of reasons, and that the ALJ erred by failing to seek the chart notes of Martha

Barcelos, APRN, and treatment records from October 17, 2018, to the date of the ALJ's

decision on February 8, 2019.  Id. at 1-3.

As an initial matter, "[t]he Second Circuit has held that it is not per se error for an

ALJ to make a disability determination without having sought the opinion of the

claimant's treating physician."  Delgado v. Berryhill, No. 17-CV-54, 2018 WL 1316198,

at *8 (internal quotations and citations omitted).  "[A] medical source statement is not

necessarily required to fully develop the record where 'the record contains sufficient

evidence from which an ALJ can assess the [claimant's RFC].'"  Crespo v.

Commissioner of Social Security, No. 18-CV-435, 2019 WL 4686763, at *3 (D. Conn.

Sept. 25, 2019) (quoting Tankisi v. Comm'r of Soc. Sec., 521 F. App'x. 29, 34 (2d Cir.

2013)).  According to the Tankisi court, the "sufficient evidence" standard evidence was

at least met when the medical records were "extensive," "voluminous," and included "an

assessment of [the claimant's] limitations from a treating physician."  Tankisi, 521 F.

App'x. at 34.  In interpreting Tankisi, another Judge in this District has found that, "[i]n

essence, [it] dictates that remand for failure to develop the record is situational and

depends on the circumstances of the particular case, the comprehensiveness of the

---

[1] Angelica also argues that the ALJ did not adequately develop the record because he failed to seek medical source statements from APRN Severance.  Pl.'s Mem. at 5-6 ("The Record before the Court indicates no efforts whatsoever by the ALJ to secure medical source statements from . . . APRN Severance").  The hearing before the ALJ was on January 9, 2019, and he issued his opinion on February 13, 2019.  According to the information available in the record and plaintiff's own memo, Angelica did not see APRN Severance for the first time until March 18, 2019.  AR at 46-49, 55-60; Pl.'s Mem. at 3.  The ALJ, of course, could not have been obligated to seek a medical source statement from an APRN whom Angelica had not yet seen at the time of the hearing and his decision.

administrative record, and . . . whether an ALJ could reach an informed decision based on the record.  Holt v. Colvin, No. 16-CV-1971, 2018 WL 1293095, at *7 (D. Conn Mar. 13, 2018) (internal quotations and citations omitted).

In practice, however, this standard is often not met in cases where there is no medical source statement.  See, e.g., Cordova v. Saul, No. 19-CV-0628, 2020 WL 4435184, at *4-5 (D. Conn. Aug. 3, 2020) (noting that a medical source statement was "[a]bsent from the record," identifying "important gaps," and holding that "the record should have included a medical source statement"); Guillen v. Berryhill, 697 F. App'x. 107, 109 (remanding for failure to develop the record where the ALJ had failed to obtain a medical source statement from the claimant's treating physician, and "[t]he medical records discuss her illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work"); Swanson v. Colvin, No. 12-CV-645-S, 2013 WL 5676028, at *5 (W.D.N.Y. Oct. 17, 2013) ("[a]bsent a reasonable explanation for the failure to obtain an RFC assessment from any treating source, the Court cannot conclude the ALJ fulfilled her affirmative duty to develop the record").

Simply having a medical source statement in the record is not, however, "dispositive."  Delgado, 2018 WL 1316198 at *7.  Even when the record includes such a statement, courts will occasionally still remand for failure to develop the record if the medical opinions on record do not sufficiently address the claimant's limitations.  See, e.g., id. (remanding for failure to develop the record when the opinion for a treating source accounted only for the claimant's mental limitations, and the ALJ had concluded that the claimant had a severe physical impairment as well); Card v. Berryhill, No. 18-

CV-1060, 2019 WL 4438322 (D. Conn. Sept. 16, 2019) (remanding in part because the sole medical source statement on record came from the claimant's physical therapist, but it did not address inconsistencies in the record and the ALJ did not seek clarifications or opinions from the claimant's treating physician).

Of course, <u>Tankisi</u>, its progeny, and the case law interpreting the obligation of an ALJ to seek medical source statements to develop the record all deal with claims made when the old treating physician rule was in effect, and predate the introduction of the new regulations for considering medical opinions for claims filed on or after March 27, 2017. 20 C.F.R § 404.1520c; 20 C.F.R. § 404.1527.[2] The old treating physician rule "of necessity dovetail[ed]" with the ALJ's obligation to develop the record, as the old rule "mandate[d] that the opinion of a claimant's treating physician regarding the nature and severity of [the claimant's] impairments[ ] be given controlling weight if it [was] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [the] case record." <u>Hoehn v. Colvin</u>, No. 14-CV-6401-L, 2016 WL 241365, at *2 (W.D.N.Y. Jan. 21, 2016). Because it was possible that a medical source statement could be given controlling weight, the failure to secure one was particularly troublesome under the old treating physician rule. <u>See, e.g.</u>, <u>Delgado</u>, 2018 WL 1316198 at *7 (D. Conn. Sept. 24, 2012) (citing cases and tying the importance of seeking the expert opinion of a treating physician in part to the fact that such an opinion can be binding on the ALJ).

---

[2] Angelica's claim was filed after March 27, 2017, and as such is assessed using the new regulations.

The new regulations undo the requirement, provided certain conditions are met, to give a medical source statement from the treating physician controlling weight. 20 C.F.R. § 404.1520c.  They state that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)."  Id. Instead, the Commissioner will consider opinions from the medical source using the factors laid out in subsection (c) of section 404.1520c, with the "most important factors . . . [being] supportability . . . and consistency."  Id.

Civil actions seeking to overturn the Commissioner's decision denying SSI benefits for claims filed on or after March 27, 2017, have only recently begun to be addressed in the district courts.  As such, the Second Circuit has not yet had the opportunity to squarely address the impact the new regulations have on the medical source statement and substantial evidence jurisprudence discussed above.  But even when medical source statements will not be afforded controlling weight, Tankisi suggests that the rule it sets out would remain unaffected.  The Tankisi court valued medical source statements because they afforded physicians the opportunity to explicitly assess the claimant's limitations and RFC, a necessary component of developing the record.  Tankisi, 521 F. App'x. at 33-34.  When there was no medical source statement in the record, but the treatment notes otherwise included a comprehensive assessment of the claimant's RFC from the treating physician, the court held that a medical source statement was not necessary to complete the record, even though the treatment notes themselves would not be given controlling weight.  Id.  Thus, the court viewed medical source statements as an important – though not always necessary – tool for developing the record, independent of the weight the ALJ was

required to afford them.  It follows that under the new regulations, the <u>Tankisi</u> rule would remain in effect: remand for failure to develop the record by obtaining a particular medical source statement depends on the circumstances of the case and will only be required if the record does not otherwise "contain[ ] sufficient evidence from which an ALJ can assess the petitioner's [RFC]. " <u>Id.</u> at 34.

Here, the record includes anywhere from 3.5 to 4 medical source statements, depending on how they are counted.  The first is from Angelica's therapist, Alyssa Boynton, and is dated November 13, 2017.  It is co-signed by Katherine Willis, LCSW. AR at 618-22.  It states that Angelica's diagnoses are: disruptive mood dysregulation disorder; major depressive disorder, recurrent episode, moderate; other specified anxiety disorder, and; cannabis use disorder, severe.  <u>Id.</u> at 618.  The document does not list bipolar disorder or PTSD as diagnoses, even though APRN Roberts had included both conditions as diagnoses in her treatment notes on Angelica's psychiatric evaluation two months earlier.  <u>Id.</u> at 604.  The record reflects that Boynton had at this point been seeing Angelica biweekly for less than three months.  <u>Id.</u> at 618.  According to Boynton, Angelica's response to treatment had thus far "been positive."  <u>Id.</u>  She noted that Angelica was "oriented towards person, place, and thing.  Memory is intact as well as her attention and concentration."  <u>Id.</u> at 619.  Angelica was assessed to have "[s]ometimes a problem, or [r]educed ability" in a variety of social interactions, and "[f]requently a problem, or [l]imited ability" in respecting or responding appropriately to authority.  Her task performance was assessed to range from "[r]educed ability" to "[a]verage ability/functioning."

The second medical source statement (or half statement), is of mysterious origins. Only pages 3 and 5 are included in the record, there is no date, and the signature page is missing. According to the "Court Transcript Index" provided by the Social Security Administration, the document is dated March 28, 2018, and is from Meghan Slomcinsky, LPC, and Robert Grillo, M.D. See Doc. No. 16 at 4. The parties, however, feel differently. In their Joint Statement of Facts, both agree that "[t]he handwriting [in the document] is that of Alyssa Boynton," and that it was faxed from the Wheeler Clinic on April 4, 2018. Plaintiff's Statement of Material Facts, ¶ 22, n. 16; Defendant's Response to Plaintiff's Statement of Facts ¶¶ 18-24.[3] The page listing Angelica's diagnoses is missing, though her capacity to carry out social interactions has diminished compared to Boynton's November 2017 assessment. AR at 645. A note accompanies the ratings – all but one of which are "[l]imited ability" – and reads: "The patient has issues interacting with others when she feels she is being disrespected, which occurs often when she is within a manic episode. The patient is unable to appropriately get along with others when she feels triggered by them." AR at 645.

The third and fourth medical source statements were both signed by APRN Barcelos on May 25, 2018. Id. at 647-52. The second document was co-signed by Dr. Grillo on May 30. APRN Barcelos states that she has only "only seen [Angelica] twice." Id. at 647. There is no record of Dr. Grillo having seen Angelica. This time, the listed diagnoses include: PTSD, chronic; bipolar disorder, current episode depressed, moderate, and; other specified anxiety disorder. Id. at 647. Angelica was "continu[ing] to struggle with severe anxiety and mood dysregulation," and she "continue[d] to be

---

[3] The ALJ also believes this statement is from Alyssa Boynton. AR at 22.

irritable, easily agitated, and ha[ve] difficulty getting along with others.  Id.  Her
impairment and symptoms were assessed to be "[f]air if compliant with treatment."  Id.
If Angelica tried to work full time, APRN Barcelos anticipated that she would miss
"[m]ore than four days per month" due to her impairments.  Id. at 650.

In his opinion, the ALJ found both the Boynton opinion and the unsigned opinions
– as well as the opinions of two State agency psychological consultants and one from
Jesus A. Lago, M.D., from 2012 – to be persuasive.  Id. at 21-22.  Noting that Barcelos
had only seen Angelica twice and that she "did not provide objective findings," he found
her opinion to be "not well-supported" and "unpersuasive."  Id. at 23.

The defendant argues that this is sufficient to develop the record.  Def.'s Mem. at
4-8.  "In addition to the treatment notes from [the] Wheeler Clinic," the Commissioner
argues, "the record contains two medical opinions from nurse practitioner Barcelos, an
opinion from Plaintiff's therapist, Ms. Boynton, and two state agency consultants . . .
Despite all of this evidence, including five opinions regarding her ability to function,
Plaintiff argues that the ALJ should have obtained additional medical opinions."  Id. at 5.

Of course, the bare number of medical opinions is not determinative.  If there are
gaps in the record related to the claimant's RFC, the opinions must be sufficient to fill
those gaps.  Delgado, 2018 WL 1316198, at *7 (remanding when "the ALJ had no
reason to believe that the two opinions . . . [in the record] would be sufficient to fill the
gap").

Here, meaningful gaps in the record do exist.  While the treatment notes at the
Wheeler Clinic spanning from August 2017 to April 2019 are consistently provided –
with the exception of the period in 2018 when Angelica was discharged from the clinic

due to poor attendance – the notes themselves do not present evidence or informal opinions as to how Angelica's mental impairments would impact her capacity to work. To be sure, there are assessments about her memory, attention, and concentration, as well the progress of her treatment. But her continued struggle with mood swings, aggressive behavior, and diagnosed mental conditions are not assessed in a manner that by itself would be "sufficient evidence from which [the] ALJ [could] assess" her RFC. Tankisi, 521 F. App'x. at 34.

Nor do the medical source statements in the record fill that gap. In the context of mental health impairments, longitudinal assessments are particularly important. Estrella, 925 F.3d at 92 (finding [t]he ALJ made no attempt to 'reconcile' or 'grapple with' the apparent longitudinal inconsistencies in [the claimant's mental health"). ALJs are "cautioned" against "rely[ing] heavily" on the findings of physicians who have had minimal interaction with the claimant, and that "concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health." Id. at 98 (finding that opinion of "a one-time consultative psychologist [did] not provide a good reason for diminishing" the opinion of a physician who had treated the claimant for a lengthy period) (internal quotations and citations omitted).

Here, both the treatment notes and the medical source statements provide evidence of Angelica's "fluctuating state of mental health." Id. at 98. Although Angelica's response to treatment was generally positive, AR at 618, the treatment notes show clear periods of regression and the cyclical nature of symptoms that the Second Circuit has recognized are characteristic of mental illness. Estrella, 925 F.3d at 97.

Angelica's medication continued to be changed, and she was observed as having "behavior . . . inappropriate for age. Mood swings. Poor judgment." AR at 663. Despite this, the ALJ instead chose to emphasize the periods of her treatment where she had improved. Id. at 20. But it is precisely in these circumstances where medical source statements from physicians familiar with the claimant's condition over a prolonged period are particularly important to develop the record.

Unfortunately, there are no such opinions in the record in this case. The first medical source statement from Angelica's therapist, Alyssa Boynton, was signed after Boynton had been seeing her for less than three months, and was well over a year before the hearing in front of the ALJ. To the extent that the two pages from the second half statement four to five months later add anything to the record, they indicate that Boynton had revised her assessment of Angelica's capacity downward in a significant way (assuming the second opinion was indeed from Boynton, as the parties stipulate). Finally, APRN Barcelos signed the third and fourth statements after only seeing Angelica twice as her "medication provider." There are no treatment notes from these two visits in the record, but given Angelica's limited interaction with APRN Barcelos, the ALJ correctly discounted her opinion.

It is not the case that the medical opinions necessary to fill the gaps in the record – particularly the gaps related to Angelica's ability to function in a workplace and questions about how frequently her impairments would cause her to miss work or be off task – could not have been obtained. APRN Roberts treated Angelica for lengthier periods and would have been well-positioned to opine on her capacity. It appears from the record that, just before the hearing before the ALJ, Dr. Twist also began seeing

Angelica, as did APRN Severance after the hearing.  Id. at 662-64; 37-39; 55-60.

Finally, given the incomplete follow-up medical source statement from Boynton, the ALJ

should have solicited an updated opinion from her as well. Delgado, 2018 WL 1316198

at *11 ("[w]here the record contains a treating source opinion, but the opinion is

incomplete, unclear, or inconsistent, the Second Circuit has held that the ALJ's duty to

develop the record requires the ALJ to seek additional information") (citations omitted).

The failure to develop the record was not harmless error.  For example, the ALJ

relied on the vocational expert's testimony to conclude that Angelica could perform the

requirements of a laundry worker, kitchen helper, and hand packer.  AR at 24.

However, during the hearing, the vocational expert also testified that, if Angelica's

symptoms caused her "to become off task at unpredictable intervals, and . . . those

were in the range of ten to 15% of a typical workday or workweek of either being absent

from the worksite or off task," there would be no jobs she could maintain.  It is unclear

how the ALJ concluded that Angelica's symptoms would not require her to miss that

time.  Further development of the record is necessary to address questions like these.

For these reasons, remand to develop the record is warranted here.  On remand,

the ALJ should seek an updated medical source statement from Boynton, as well as a

current medical opinion from Angelica's current treating physician at the Wheeler Clinic.

Because the record was not fully developed, the court does not reach the questions

about whether the ALJ's findings were supported by substantial evidence.  Cordova,

2020 WL 4435184 at *5 ("[w]here, as here, an ALJ fails to adequately develop the

record in reaching a conclusion on a claimant's [RFC], the Court is unable to review

whether the ALJ's denial of benefits was based on substantial evidence") (internal quotations and citations omitted).

B.    Other Issues

Angelica raises two additional arguments that the court finds useful to address here, even if it is not obligated to do so.

First, she argues that the ALJ's Step Five findings are not supported by substantial evidence, insofar as he relies on the testimony of a vocational witness who "did not cite a single source upon which he could have relied for his job incidence testimony." Pl.'s Mem. at 15 (emphasis omitted). The court does not agree. In Crespo, 2019 WL 4686763 at *8-9, Judge Meyer evaluated a similar claim that "the ALJ's Step Five analysis was invalid because the ALJ relied on the testimony of a vocational witness who did not identify the sources of her job incidence testimony." Id. at *8 (internal quotations omitted). He held that the Supreme Court's decision in Biestek v. Berryhill, 139 S.Ct. 1148 (2019), "weighs against the type of categorical rule [the claimant] urges here . . . If the substantial evidence requirement does not categorically require a vocational expert to disclose her job-numbers data, even when specifically requested, neither does it require a vocational expert to disclose the general source of her jobs-number data in the absence of any request." Crespo, 2019 WL 4686763 at *9. This court finds the analysis and holding in Crespo persuasive.[4]

_____

[4] To the extent that Angelica puts forth arguments urging the court to conduct its own analysis of available job numbers and second guess the vocational expert's conclusions, the court declines to do so. See Bavaro v. Astrue, 413 F. App'x. 382, 384 (2d Cir. 2011) (declining to credit claimant's argument that the number of available jobs was lower than the vocational expert had testified to, and holding that since the expert "testified to the existence of such jobs at the national and regional level . . . [t]he ALJ was entitled to credit that testimony").

Second, Angelica also argues that the ALJ's Step Five findings are not supported by substantial evidence because the ALJ did not take into consideration her physical impairments, specifically her asthma.  Pl.'s Mem. at 22.  Yet – crucially – in the course of the almost year and a half process from the submission of her application for SSI benefits in October 2017, to the Appeals Council's denial of her request to review the ALJ's decision in March 2020, Angelica does not appear to have even once argued that her physical impairments have limited her ability to work.  Nor do the treatment notes or medical source statements in the record indicate a severe physical impairment that has been left unaddressed.  Accordingly, the ALJ was not required to account for her potential physical limitations in evaluating her RFC or making his Step Five findings.

## VI.  CONCLUSION

For the reasons stated above, the court vacates the ALJ's decision and remands for further proceedings, thereby denying the Commissioner's Motion for an Order Affirming the Decision of the Commission (Doc. No. 20) and granting in part and denying in part Angelica's Motion to Reverse the Decision of the Commissioner (Doc. No. 18), insofar as her Motion seeks an order reversing the ALJ's decision.  The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the undersigned.

**SO ORDERED.**

Dated at New Haven, Connecticut this 14th day of July 2021.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge